# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CRYSTAL AMMONS,
                    *Plaintiff-Appellee,*

v.

STATE OF WASHINGTON DEPARTMENT
OF SOCIAL AND HEALTH SERVICES;
NORM WEBSTER, individually and
in his official capacity acting
under color of state law; MARY
LAFOND,
                    *Defendants-Appellants.*

No. 09-36130

D.C. No.
3:08-cv-05548-RBL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
November 5, 2010—Seattle, Washington

Filed August 17, 2011

Before: Betty B. Fletcher and Jay S. Bybee, Circuit Judges,
and Claudia Wilken, District Judge.*

Opinion by Judge B. Fletcher;
Partial Concurrence and Partial Dissent by Judge Bybee

---

*The Honorable Claudia Wilken, United States District Judge for the
Northern District of California, sitting by designation.

---

**COUNSEL**

David P. Moody, Hagens Berman Sobol Shapiro LLP, Seattle, Washington, for the plaintiff-appellee.

Ian M. Bauer and Patricia Campbell Fetterly, Office of the Attorney General of Washington, Olympia, Washington, for the defendants-appellants.

---

**OPINION**

B. FLETCHER, Circuit Judge:

Appellants Mary LaFond ("LaFond") and Norman Webster ("Webster") (collectively "Appellants"), relying on qualified immunity, appeal the district court's order denying their motion for summary judgment. Appellee Crystal Ammons ("Ammons") sued LaFond and Webster under 42 U.S.C. § 1983 for violating her Fourteenth Amendment substantive due process right to safe conditions while in the custody of a state-run mental institution. The district court denied Appellants' motion for summary judgment, rejecting both LaFond's and Webster's claims of qualified immunity. It concluded that the record, when read in the light most favorable to Ammons, supported the claim that Appellants failed to exercise professional judgment with respect to Ammons's safety. Appellants timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part and reverse in part.

**I.**

The events in this case took place at the Washington State Department of Social and Health Services's ("DSHS") Child

Study and Treatment Center ("CSTC"). The CSTC is a residential psychiatric hospital for severely emotionally and behaviorally disturbed children, which, in 2001, served approximately forty-eight inpatients. CSTC's residents are both patients at CSTC and in its custody.

Appellant Mary LaFond was CSTC's Chief Executive Officer from 1995 to the end of March 2003. Appellant Norm Webster worked intermittently at CSTC in various capacities between 1970 and 1990. He then served as the Director of Nursing Services from January to April 2003.[1] In April 2003, upon LaFond's departure from CSTC, Webster succeeded her as CSTC's CEO.

On February 10, 2000, during LaFond's tenure as CEO, she received a letter from CSTC Director of Nursing Services, Mary Claire Rutherford, which raised, among other things, concerns about improper clinical staff handling of reported sexual incidents in the resident cottages.

In early 2001, also during LaFond's tenure, a patient at CSTC ("Resident A") alleged that a male staff member named Anthony Grant had sexually molested her. These allegations were reported to Child Protective Services ("CPS") and, according to LaFond, Grant's access to the female patients was restricted during the resulting investigation. CPS conducted interviews with Resident A, Grant, other staff, and at least one patient. Resident A repeated to the CPS investigator that Grant had molested her. While later speaking with Dr. Jan Bacon, the resident psychologist, however, she recanted her accusation, stating at the same time that she was upset about losing contact with Grant. After LaFond informed the CPS investigator that Resident A had recanted, CPS concluded that the allegations were "unfounded" and closed the investigation.

---

[1]Webster left in February of 1990 and returned in January 2003. He was not employed at CSTC in 2000 or 2001.

In October 2001, after CPS closed its investigation of Grant, Crystal Ammons was admitted to CSTC. Ammons was a thirteen-year-old girl who had become a dependent of the State of Washington at the age of four. Prior to her placement at CSTC, Ammons had been raised by her maternal grandmother and then by an aunt and uncle; she was removed from her aunt and uncle's care after she reported that her uncle had sexually abused her. Ammons's uncle was ultimately convicted of molesting her. She was moved into foster care in March 1995, at age seven. Between the ages of seven and eighteen, Ammons was placed in various residential care facilities and psychiatric hospitals, one of which was CSTC.[2] In October 2001, when she began residing at CSTC, Ammons was in the foster care of social worker Corrie Tienhaara ("Tienhaara") and her family.

While Ammons was at CSTC, she stayed in regular contact with Tienhaara, who became concerned about Ammons's preoccupation and seemingly close relationship with Grant. Tienhaara's concerns grew upon learning that Grant had given Ammons gifts, including a stuffed animal and compact discs. Tienhaara visited CSTC for the first time in November 2002, at which time she communicated her concerns about Grant to Ilys Hernandez ("Hernandez"), the head of Ammons's cottage at CSTC. Tienhaara voiced her concerns in a straightforward manner, and she specifically requested that Grant not be permitted to be alone with Ammons. In response, Hernandez told her that Grant was never alone with Ammons and that CSTC had a strict policy against male counselors being alone with female patients. Hernandez did not reveal that any other allegations of abuse had been made against Grant.

In March 2003, Hernandez accompanied Ammons to Tienhaara's home in North Dakota, in preparation for her dis-

_____

[2]By the time Ammons aged out of the system at age eighteen, she had resided in fifteen different foster homes, residential facilities, and psychiatric hospitals.

charge from CSTC and her transition back into Tienhaara's family. There, Tienhaara repeated her concerns to Hernandez, and was again reassured that Grant and Ammons would not be alone together. In late March 2003, however, Tienhaara learned Ammons was scheduled to go on a one-on-one outing with Grant. When she called Hernandez to voice her objection, she was told that the facility "[wouldn't] go ahead and approve that."

Ammons's file reveals that, during her time at CSTC, the CSTC staff documented 188 incidents of Ammons's flirtatious behavior with male staff. The notes associated with her evaluations indicate that she had "boundary problems" with the staff, and they direct staff members to closely monitor her interactions specifically with male employees. Throughout the early part of 2003, before Ammons left the facility, it was further noted that Ammons had a "crush" on one of the male staff members, and that she was spending time with him alone and seeking out his attention.

Jessica Ramsey, a fellow patient at CSTC who was friends with Ammons, testified that Grant was "extremely flirtatious" with her and Ammons, and that their flirtatious interactions were apparent to Hernandez and Dr. Bacon. She further testified that it was obvious how infatuated Ammons was with Grant, but that no restrictions were ever placed on Grant's interactions with Ammons or Ramsey. Rather, according to Ramsey, the frequency of Grant's interactions with her and Ammons continued to escalate. Ramsey stated that she and Ammons would pass notes through other staff members to Grant so often that "the night shift was getting mad" at her. She also testified that she and Ammons had "entire sections on the walls of [their] room (where any staff member could see them) . . . dedicated to Mr. Grant," where they posted flirtatious signs such as "Hottie Alert Tony," and "Tony's Finer than Silk."

According to Ramsey, Grant gave Ramsey and Ammons pictures of himself, letters, stuffed animals for Valentine's

Day, music CDs and, at least to Ramsey, his personal cell phone number. On one occasion, Grant painted Ramsey's nails. Ramsey testified that she was often alone with Grant in the cottage's TV room or in her "pod," a part of the cottage with female bedrooms, including hers. She further testified that she "once or twice" saw Grant and Ammons leave through the pod door to go to the "canteen," a part of the building with a soda machine and a snack machine.

On April 18, 2003, Ammons was discharged from CSTC and went to live in North Dakota with Tienhaara and her family. After Ammons left CSTC, Tienhaara discovered that she and Grant were corresponding via e-mail. These e-mails were extremely flirtatious and revealed that Ammons and Grant were romantically involved. For example, Ammons signed her e-mails "Crystal Grant," and Grant once wrote, "Wanna go to the canteen tonight? ;) (I wish!)." Shortly after Tienhaara discovered the e-mails, Ammons told her that Ammons and Grant had been sexually involved from January 2003 until she left CSTC. The relationship Ammons described included sexual intercourse and other types of sexual activity that took place on multiple occasions in the "canteen area." At the time this sexual relationship began, Grant was twenty-nine years old, and Ammons was fourteen. Tienhaara contacted CSTC about this molestation, and CSTC placed Grant on leave. After investigating the matter for several months, CSTC concluded that Grant had, while on duty, engaged in sexual intercourse with Ammons during her residence at the facility. CSTC eventually fired Grant.[3]

Ammons sued DSHS, LaFond, and Webster in Pierce County Superior Court, alleging that (1) DSHS was negligent

[3]Grant was criminally charged with three counts of rape of a child in the third degree and one count of child molestation in the third degree. On February 22, 2005, Grant entered an *Alford/Newton* plea to the charge of communication with a minor for immoral purposes in violation of Washington law.

under state law for failing to protect her from the "known dangerous proclivities of Anthony Grant," and (2) LaFond and Webster were deliberately indifferent to Ammons's safety, in violation of 42 U.S.C. § 1983. The case was removed to federal district court. After the exchange of some discovery, Ammons moved for summary judgment. Appellants cross-moved for the same, arguing that they were entitled to qualified immunity.

The district court denied all parties' motions for summary judgment, finding that issues of material fact remained unresolved. The court held that LaFond and Webster were not, under *Neely v. Feinstein*, 50 F.3d 1502 (9th Cir. 1995), entitled as a matter of law to qualified immunity. The court reasoned that, viewed in the light most favorable to Ammons, the evidence established that LaFond and Webster had "numerous warnings" of the risk posed to Ammons by Grant, and that Appellants "did literally nothing" in response to those warnings. LaFond and Webster timely appealed. The issue of whether they are entitled to qualified immunity is now before us.

## II.

We first resolve whether we have jurisdiction to hear this interlocutory appeal. "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). This is because "[w]hen summary judgment is denied to a defendant who urges that qualified immunity shelters her from suit, the court's order finally and conclusively disposes of the defendant's claim of right not to stand trial." *Ortiz v. Jordan*, 131 S. Ct. 884, 891 (2011) (citing *Mitchell*, 472 U.S. at 527) (internal quotation marks and alteration omitted). "[T]he appealable issue is a purely legal one: whether the facts alleged [ ]by the plaintiff . . . support a claim of violation of

clearly established law." *Mitchell*, 472 U.S. at 528 n.9. Accordingly, "[o]ur jurisdiction in these matters generally is limited to questions of law and does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact." *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001); *see also Ortiz*, 131 S. Ct. at 891. "Where disputed facts exist, however, we can determine whether the denial of qualified immunity was appropriate by assuming that the version of the material facts asserted by the non-moving party is correct." *Jeffers*, 267 F.3d at 903 (citations omitted).

In this appeal, we are asked to resolve multiple issues of law, including the correct standard under which to assess alleged violations of Fourteenth Amendment substantive due process rights by state hospital administrators, and the extent to which this law is clearly established. We must also determine whether the facts alleged and shown by Ammons, some of which are in dispute, support a constitutional violation. Accordingly, we have jurisdiction to hear this appeal, and we evaluate Appellants' claims of qualified immunity by resolving all factual disputes in Ammons's favor. *See id.*

## III.

We review de novo a district court's denial of qualified immunity by summary judgment. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007) (citing *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 945 (9th Cir. 2003)). In reviewing the denial of qualified immunity, we consider the "purely legal issue of whether facts alleged by the plaintiff support a claim of violation of clearly established law" such that appellants are not immune from suit. *Lytle v. Wondrash*, 182 F.3d 1083, 1086 (9th Cir. 1999) (internal citation and quotation marks omitted).

[1] Qualified immunity shields state officers from civil liability for damages unless (1) the facts alleged by the plaintiff

establish a violation of the plaintiff 's constitutional rights; and (2) the constitutional right in question was "clearly established" when the defendant committed his alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815-16 (2009). Put another way, "[t]he principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Id*. at 823. Courts are given the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 818.

Here, it is difficult to assess whether the facts alleged by Ammons establish the alleged constitutional violation without setting forth the governing law. Therefore, we first examine the clearly established law with respect to the alleged Fourteenth Amendment violation, and then determine whether the facts before us support such a violation.

## IV.

For a constitutional right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "in light of pre-existing law the unlawfulness must be apparent." *Id.*

### A. The Constitutional Right

Although Ammons asserts in her complaint that Appellants violated her constitutional right to "equal protection, as well as [her] constitutionally protected right to procedural and due process of law," the alleged facts and her contention that LaFond and Webster were "deliberately indifferent" to her safety make clear that her § 1983 claim is based on her Fourteenth Amendment substantive due process right to safe con-

ditions while involuntarily committed to the custody of a state actor.

**[2]** Involuntarily committed patients in state mental health hospitals have a Fourteenth Amendment due process right to be provided safe conditions by the hospital administrators. In *Youngberg v. Romeo*, 457 U.S. 307, 310 (1982), the Supreme Court was confronted with an involuntarily committed mental patient in a state hospital who alleged that, while at the hospital, he had been injured on numerous occasions "by his own violence and by the reactions of other residents to him." The patient, Romeo, sued three hospital administrators for failing to institute appropriate procedures to prevent the injuries they "knew, or should have known" Romeo was receiving, thereby violating Romeo's rights under the Fourteenth Amendment. *Id*. Noting that "the right to personal security constitutes an 'historic liberty interest' protected substantively by the Due Process Clause," the Court held that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed — who may not be punished at all — in unsafe conditions." *Id*. at 315-16 (citations omitted).

**[3]** According to *Youngberg*, the Constitution requires that hospital officials, in order to protect a patient's right to safe conditions, exercise professional judgment. *Id*. at 321-22. The Court explained that liability may be imposed for failure to provide safe conditions "when the decision made by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.[4] *Youngberg*, then, created a stan-

---

[4]Although the issue was not directly before it, the Court also held that the district court should have admitted expert testimony that was excluded because such testimony may have been "relevant to whether [the administrators'] decisions were a substantial departure from the requisite professional judgment." *Id*.

dard whereby whether a hospital administrator has violated a patient's constitutional rights is determined by whether the administrator's conduct diverges from that of a reasonable professional. We refer to this as the "*Youngberg* professional judgment standard." In distinguishing this standard from the "deliberate indifference" standard used in Eighth Amendment cruel and unusual punishment cases, the *Youngber*g Court noted that "[p]ersons who have been involuntarily committed are entitled to *more considerate treatment and conditions of confinement* than criminals whose conditions of confinement are designed to punish." *Id*. at 321-22 (emphasis added). The Court approvingly cited the *Youngberg* professional judgment standard in *County of Sacramento v. Lewis*, 523 U.S. 833, 852 n.12 (1998), noting that "[t]he combination of a patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare."[5]

---

[5]The dissent's formulation of the *Youngberg* professional judgment standard is misleading. According to our dissenting colleague, we should examine only whether LaFond exercised any professional judgment at all, because, under *Youngberg*, "exercising *any* professional judgment will shield a state hospital professional from § 1983 liability." The *Youngberg* standard, however, is not so permissive. In requiring that "professional judgment" be exercised, the Court made clear that the judgment of professionals must not depart substantially from "accepted professional judgment, practice, or standards," 457 U.S. at 323, with respect to protecting a patient's right to safety, *id*. at 322. Just "any" judgment, therefore, will not do; the official must exercise judgment that comports with an objective standard. *Id*. at 322-23 (noting that the courts must make certain that "professional judgment in fact was exercised").

Moreover, the dissent misconstrues the nature of the presumption articulated in *Youngberg*. While *Youngberg* does state that decisions made by a public official are presumptively valid as an initial matter, the case also makes clear that the method by which that presumption is overcome is the application of the *Youngberg* professional judgment standard itself, that is, by assessing whether the actions of the professional meet this objective standard. *Id*. at 323. In other words, the *Youngberg* professional judgment standard does not *contain* any presumption in favor of government officials; instead, the standard is the mechanism by which we assess whether the presumption has been overcome. Our task, therefore, is to apply the *Youngberg* professional standard to determine whether the presumptive validity of LaFond's and Webster's conduct has been rebutted. This is precisely what we do in this opinion.

**[4]** Relying upon *Youngberg*, the Ninth Circuit has repeatedly recognized the Fourteenth Amendment right of involuntarily committed patients to safe confinement conditions. *See Neely v. Feinstein*, 50 F.3d 1502, 1507 (9th Cir. 1995) ("A mental patient's right to personal security in the institution to which he or she is committed was clearly established in 1988 [the year of the alleged violation]."); *Flores by Galvez-Maldonado v. Meese*, 942 F.2d 1352, 1363 (9th Cir. 1991) (describing *Youngberg*'s holding as "when individual is in state custody, state may acquire constitutional duty to ensure individual's safe care"); *Estate of Conners by Meredith v. O'Connor*, 846 F.2d 1205, 1207 (9th Cir. 1988) (holding that, under *Youngberg*, patients who have been involuntarily committed to a state mental hospital retain liberty interests in safety). Therefore, at the time the events alleged in this case took place, it was clearly established that LaFond and Webster, as state officials, had a duty to exercise professional judgment to provide safe conditions for Ammons and the other patients at CSTC.

## B.   Violation of the Constitutional Right

In light of the clearly established law that hospital officials must provide safe conditions for involuntarily committed patients, we now examine the circumstances under which state hospital officials may be held responsible for failing to do so.

We previously applied the *Youngberg* professional judgment standard in *Neely*, 50 F.3d at 1507, a case with facts remarkably similar to those presented here. There, a female patient (Neely), who had been allegedly molested by a hospital staff member (Terry), sued state mental hospital administrators and staff. Neely named as defendants Feinstein, the hospital superintendent; Hosley, the Director of Nursing; Murgo, the chairperson of the committee assigned to investigate prior accusations against Terry; and Brown, the building supervisor. *Id.* at 1506-07. Prior to Neely's allegations, two

other patients had also alleged that Terry had sexually assaulted them. *Id.* at 1505. In response to both prior incidents, Feinstein convened a committee to investigate the allegations and, both times, the committee determined "there was no evidence to substantiate the allegations against Terry." *Id.* at 1506. After the second investigation concluded, however, Feinstein issued a reprimand to Terry for showing "very poor judgment" in placing himself in situations where he was alone with female patients. *Id.* Hosley issued an oral directive barring Terry's assignment to work in the women's ward and "in one-to-one seclusion" with female patients. Hosley later lifted this restriction, and Brown assigned Terry to work in one-on-one seclusion with Neely. It was then that Terry's alleged assault of Neely occurred. *Id.* at 1506.

In our analysis, we first acknowledged that the *Youngberg* professional judgment standard served as clearly established law at the time of the alleged abuse. *Id.* at 1507. We recognized that, in *O'Connor*, 846 F.2d at 1208, another case involving a patient grievously harmed in a state-run mental hospital, we applied the objective *Youngberg* standard and equated it " 'to that required in ordinary tort cases for a finding of *conscious indifference* amounting to gross negligence.' " *Neely*, 50 F.3d at 1507 (quoting *O'Connor*, 846 F.2d at 1208) (emphasis added).[6]

**[5]** We further explained that this "conscious indifference" standard is not the same as the "deliberate indifference" standard used in the Eighth Amendment cruel and unusual punishment context and extended to alleged violations of pre-trial

---

[6]As the dissent points out, in *L.W. v. Grubbs*, 92 F.3d 894, 897 (9th Cir. 1996), we disapproved of the use of a "gross negligence" standard in a prison nurse's § 1983 action against her supervisors for violation of her substantive due process rights after an inmate allegedly attacked her. We noted that *Neely*'s use of the term "gross negligence" was not necessary to the decision, and should be limited to the claims of "captive" plaintiffs "injured because of a miscarriage of the 'professional judgment of a [government] hospital official.' " *Id.*

detainees' rights under the Fourteenth Amendment. *Id.* We therefore rejected the argument that the applicable standard of "conscious indifference" required the plaintiff to show that the officials were "subjectively aware of the risk" posed to the patient, noting that although a "subjective awareness requirement comported with the Eighth Amendment's proscription against cruel and unusual punishment," there is no such requirement to enforce patient rights arising from the Fourteenth Amendment. *Id.* at 1508.[7] Accordingly, we recognized that the *Youngberg* professional judgment standard is "necessarily an *objective* test." *Id.* (emphasis added).[8]

**[6]** We concluded that, at the time of the hospital officials' actions, the law in this circuit clearly established that "(1) patients have a constitutional right to be safe in the state institution to which they are committed, and that (2) in the face of known threats to patient safety, state officials may not act (or fail to act) with conscious indifference, but must take ade-

---

[7]Indeed, *Neely* further notes that even our Fourteenth Amendment jurisprudence that applies the "deliberate indifference standard," rather than the "conscious indifference" standard applicable here, has never "required officials to have subjective awareness of the risk of harm in order to be deemed 'deliberately indifferent.' " *Id.* (citation omitted).

[8]LaFond and Webster cite one of our recent decisions, *Tamas v. Department of Social & Health Services et al.*, 630 F.3d 833 (9th Cir. 2010), for the proposition that deliberate indifference requires a plaintiff to show that the official was subjectively aware of facts from which an inference of substantial risk could be drawn. *Tamas*, however, interprets the "deliberate indifference" standard in the specific context of the state's obligation toward foster children, consistent with the holdings in other circuits. *Id.* at 844-45. *Tamas* makes no reference to *Youngberg*, *Neely*, or any case addressing the standard applicable to public hospital officials' duty to ensure the safety of their patients. Indeed, it is logical that the standard governing the state's duties with respect to foster children would differ from that governing the state's actions vis-a-vis hospital patients, as the degree of control and day-to-day responsibility that the government exerts over the latter is considerably higher. Therefore, *Neely* remains the controlling law of this circuit for purposes of this case, and *Tamas* is inapposite.

quate steps in accordance with professional standards to prevent harm from occurring."[9] *Id.*

Pursuant to this framework, we affirmed the district court's denial of qualified immunity for Feinstein on the ground that he summarily disregarded the risk that Terry, a hospital employee previously accused of sexual molestation, would sexually abuse female patients. The evidence supported a finding that Feinstein failed to exhibit "vigilance in protecting the safety of female patients, and that a reasonable hospital official would have done much more to eliminate the risk that Terry would sexually abuse female patients under the hospital's care." *Id.* at 1509.

Murgo, the chairperson of the committee convened to investigate the prior allegations against Terry, was found qualifiedly immune. *Id.* at 1511. We reasoned that, although the committee did not interview certain witnesses, it did interview those witnesses required by hospital regulations. *Id.*

Hosley, who informed the shift supervisors that Terry should not be assigned to the women's ward or to one-on-one seclusion with female patients, was found qualifiedly immune. *Id.* Although Hosley did not put this directive in writing, she did not act unreasonably because Feinstein, her supervisor, did not instruct her to do so. *Id.* Additionally, there was no evidence that Hosley was informed of the evi-

---

[9]This reference to "known threats" does not negate *Neely*'s clear instruction that subjective awareness of risk is not required in the context of this Fourteenth Amendment right. Hospital officials' knowledge of particular threats to patient safety is certainly relevant to the reasonable professional judgment standard against which their actions are assessed, that is, to the determination of whether the officials have acted with conscious indifference. Such knowledge, however, is not required to demonstrate a violation. Accordingly, *Neely* merely acknowledges that Feinstein was aware or should have been aware of the risk posed by Terry, which speaks to the actions necessary for him to discharge his duty to act in accordance with professional standards.

dence of Terry's prior sexual assaults, which Feinstein had reviewed. *Id.* Hosley's lack of awareness of the prior accusations against Terry was relevant to our assessment of the reasonableness of her actions, although it was not the basis for finding her qualifiedly immune.

Brown, the building supervisor assigned to the women's ward, was found qualifiedly immune because he had assigned Terry to the women's ward only after the restriction was lifted and in light of a staff shortage. *Id.* We held that Brown could not have been said to have acted unreasonably. *Id.*

In sum, we held the lower-level supervisors qualifiedly immune due to their compliance with hospital regulations and supervisory guidance and directives (to the extent such directives were issued), and because their conduct was reasonable in light of practical considerations. Feinstein was found subject to liability because, as head of the hospital, he failed to act to protect the safety of patients through effectively guiding lower-level supervisors to reduce the safety risk posed by Terry. Contrary to the dissent's assertions, there is nothing contradictory about this resolution.

**[7]** *Youngberg* and *Neely* serve as pre-existing, clearly established law as to what conduct supports infringement of the Fourteenth Amendment rights of involuntarily committed hospital patients. At the time of the alleged events, then, it was clear that the actions of LaFond and Webster violated the Constitution if they ran afoul of the objective *Youngberg* professional judgment[10] standard as applied in *Neely*.[11]

---

[10]Thus, the dissent's insistence that courts "have no business prescribing managerial behavior for mental institutions" is more properly directed at the decision in *Youngberg* than to our denial of qualified immunity. The Supreme Court has made it our business to assess whether a public hospital administrator's alleged failure to provide safe conditions gives rise to a constitutional violation under the *Youngberg* professional judgment standard. It also made it the business of juries to decide whether the standard has been violated.

[11]The dissent goes to great lengths to unnecessarily obscure *Neely*'s

## V.

**[8]** We now determine whether the facts of this case, as construed in a light most favorable to Ammons, could be found to amount to a violation by LaFond or Webster of Ammons's constitutional rights. In other words, we must determine whether the facts alleged, if proved, are sufficient to support a jury finding that the official's conduct was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. We review the allegations with respect to LaFond and Webster separately.

### A.  LaFond

**[9]** Here, the primary evidence that supports LaFond's liability is (1) that she knew that Grant had been previously investigated for sexual abuse of a female patient yet she allowed Grant to continue working in a cottage housing female patients without taking steps to ensure that he was not given repeated opportunities to be alone with one or more of

---

analysis and to discredit it as clearly established law. As we have discussed in this opinion, *Neely*'s reconciliation of the myriad of legal standards applied in the context of the Fourteenth Amendment is, to be sure, complex, but it nonetheless remains consistent with our precedent.

And regardless of this complexity, *Neely* makes crystal clear its conclusion that Feinstein's failure to act to ensure Neely's safety, and his specific failure to take into account the previous accusations against Terry, support a violation of the *Youngberg* standard. This conclusion, at least, serves as clearly established law. Thus, the opinion's conclusion with respect to facts remarkably similar to those here, if not its legal analysis, is undoubtedly sufficient to put LaFond on notice as to the contours of her constitutional duty with respect to patient safety. *See Anderson*, 483 U.S. at 640.

Unlike our dissenting colleague, we do not feel free to simply disregard *Neely* based on our own views of the strength of its reasoning. We are bound by this precedent and will faithfully apply it.

these patients; and (2) that she took no action in spite of increasing and documented evidence of the inappropriate relationship between Ammons and Grant.

First, as to the prior accusation made against Grant, the record reflects that Resident A repeatedly stated that Grant had touched her inappropriately, but later recanted her allegations when speaking to Dr. Bacon. At no point, however, did Resident A recant her testimony to outside investigators. That she recanted to Dr. Bacon in a moment when she was admittedly upset about losing contact with Grant, at the very least, raises doubts as to CPS's conclusion that the accusations were "unfounded." Despite these facts, of which LaFond was aware, LaFond permitted Grant to continue working unsupervised with the female patients in their residential cottages, at times in one-on-one situations.[12] LaFond declared that it was her general practice, when an accusation of staff abuse was determined unfounded, to instruct the supervisors to watch the staff member more closely and to counsel him or her about any high risk behavior. In neither her declarations nor her deposition testimony, however, does LaFond state that, after Resident A's accusation, LaFond instructed Grant's supervisors to watch him more closely or provided Grant with counseling about any high risk behavior.

Second, the facility that LaFond was charged with overseeing contained overwhelming information and signals that Grant was pursuing improper relationships with female patients and with Ammons specifically. Ammons flirted with Grant so regularly and extensively that CSTC staff frequently commented on it, both in her files and to Ammons herself. In

---

[12]We note that LaFond's awareness of the prior accusations of sexual abuse against Grant speaks to the assessment of whether LaFond acted in accordance with objective professional standards, that is, to what a reasonable official would do to ensure the safety of the patients at CSTC. In noting this awareness, we do not imply that subjective awareness of the particular risk is required to demonstrate a violation. *See* Part IV.B, *supra.*

fact, Ammons's file contained 188 references to her improper interactions with male staff, as well as documentation about her feelings toward Grant in particular. Ammons and Ramsey exchanged love letters with Grant, made posters for Grant, and received pictures of Grant, which they "plastered" on "entire sections on the walls of [their] rooms" where they were highly visible to any staff member. Notably, Ammons's foster mother repeatedly voiced her concerns about the relationship between Ammons and Grant to CSTC, and specifically asked that Grant not be permitted to be alone with Ammons. Ammons points out that CSTC is a small community, and that LaFond had every opportunity to become aware of the escalating impropriety between Grant and Ammons, and to take action accordingly. LaFond apparently failed to take affirmative steps to inform herself of the situation at CSTC, even after Rutherford had explicitly warned her about the staff's failure to respond appropriately to reports of sexual impropriety.

**[10]** We hold that, under these facts, a fact-finder could determine LaFond's actions demonstrate a substantial departure from reasonable professional judgment. LaFond was aware that Grant was previously accused of sexually molesting a minor female patient. The investigation concluded that the accusations were unfounded only because the accuser unreliably recanted. Under *Neely*, a jury could find that a reasonable administrator, exercising professional judgment with respect to providing safe conditions, would have taken Resident A's allegation into account when assigning and supervising staff members in cottages where female patients resided. While LaFond had no cause to discipline Grant, because he had been exonerated of the molestation charge, she certainly had reason, in light of her duties with respect to the safety of her patients, to manage and monitor his duties more carefully. Instead, LaFond allowed Grant to gain unfettered and

unmonitored access to the female residents, and to spend time with them on a one-on-one basis.[13]

Even more compellingly, LaFond and the rest of the CSTC staff were practically inundated with signs and indications that Ammons and Grant were engaged in an inappropriate relationship. Ammons's lack of boundaries with male staff, and her preoccupation with Grant in particular, were well documented in her files. Her particular relationship with Grant was evidenced by her behavior and the display on the wall of her room, so much so that her crush was apparent to other patients and staff members. LaFond had every reason to monitor the relationship between Grant and Ammons in light of Rutherford's warnings and Tienhaara's repeatedly voiced concerns.

Regardless of whether LaFond was subjectively aware of

---

[13]We fully acknowledge that Grant was exonerated as an official matter. This certainly does not mean, however, that, as a practical matter, his one-on-one seclusion with minor female patients did not in any way pose a risk to their safety. Indeed, Grant's subsequent sexual molestation of Ammons, like Terry's molestation of Neely, only confirms this. We accordingly recognize that a jury could conclude that a reasonable hospital administrator, in performing his or her constitutional duty with regard to patient safety, would have done more to protect vulnerable female patients.

Contrary to the dissent's argument, we do not hold that the Due Process Clause requires hospital administrators to take any action that the law otherwise forbids. We do not even suggest that the administrator must disclose previous accusations of sexual misconduct to any other party, include the accused's name on any public database, or impose any adverse consequence as a result of the accusation. Thus, the dissent's discussion of various Washington statutes and our holding in *Humphries v. County of Los Angeles*, 554 F.3d 1170 (9th Cir. 2009), *rev'd in part on other grounds*, 131 S. Ct. 447 (2010), is irrelevant. The dissent also invokes, puzzlingly, *Burlington Northern v. White*, 548 U.S. 53 (2006), a Title VII retaliation case. We do not see how the standard for retaliatory adverse employment actions in the Title VII context is relevant here. *Id.* at 66 (noting that "Title VII primarily seeks to protect . . . victims of race-based, ethnic-based, religion-based, or gender-based discrimination").

these signals, a jury could conclude that a reasonable hospital administrator in LaFond's position of authority, knowing of the previous accusations against Grant and of Rutherford's warning, would have taken steps to become aware of what was happening through a basic review of Ammons's file or by simply walking through the facility. A jury could additionally find that a reasonable hospital administrator, exercising professional judgment, would have taken steps to ensure that the staff who worked closely with Grant appreciated the seriousness of the situation and brought these signs to the administrator's attention so that she could take the necessary steps to prevent Grant from abusing his position. LaFond should have at least taken steps to ensure that she was informed of specific concerns voiced by parents such as Tienhaara so that she could look into the matter further.[14]

[11] LaFond "bears the responsibility for taking adequate steps to ensure that [her] subordinates" maintain the safety of the patients pursuant to her orders and instructions because, as the head of CSTC, LaFond "is the one who is ultimately accountable for the safety of the patients." *Neely*, 50 F.3d at 1510. Instead of taking steps to ensure that her subordinates adequately monitored the relationships between staff and patients, LaFond took literally no action whatsoever to prevent Grant from engaging in an abusive relationship with Ammons. Whether because of ignorance or a failure to fully

---

[14]The dissent makes much of the distinction between action and inaction, arguing that there exists an "infinite list of LaFond's inactions toward Ammons." To clarify, because *Youngberg* makes clear that involuntarily committed patients have an affirmative right to reasonable conditions of safety, a state official's inaction, to the extent that it speaks to his or her failure to provide such conditions, is precisely what we must evaluate in applying this standard. *See Youngberg*, 457 U.S. at 320 ("The question then is . . . whether the . . . *lack of absolute safety* is such as to violate due process." (emphasis added)).

Because, as the dissent agrees, the record contains no evidence that LaFond took steps to stay informed of any sexual impropriety between staff and patients, we construe this deficiency in Ammons's favor.

appreciate the seriousness of the situation, LaFond allowed this relationship to go on for months, unchecked and unmonitored, and it was not until Ammons returned to her foster family and continued to have contact with Grant that any action was taken. We hold that, under the facts alleged and produced, LaFond's apparent inaction and poor supervision with respect to the safety of Ammons and the other female patients support a finding that she failed to exercise professional judgment,[15] and thereby violated the Fourteenth Amendment.[16]

---

[15]The dissent faults us for reaching this conclusion without reciting precisely the "accepted professional judgment, practice, or standards" for the administration of residential health facilities for youths. If there existed such a "golden code" of professional conduct against which to measure LaFond's actions, there would be no need for a jury at all, as we judges could conclusively determine whether LaFond is liable. We accept, as the dissent repeatedly recognizes, that a conclusive application of the *Youngberg* standard will indeed require additional facts, expert testimony, and a host of other evidence in order to definitively determine what a reasonable professional would have done, that is, the standard against which to conclusively measure LaFond's actions. *Youngberg*, 457 U.S. at 323 n.31 (noting that expert testimony is relevant to whether a public employee failed to exercise the requisite professional judgment). This is precisely the role that a jury plays.

This is also why an award of summary judgment is unwarranted at this early stage. Ironically, the dissent, like us, cannot articulate the code of professional conduct for administrators of residential health facilities, and yet the dissent somehow conclusively determines that, as a matter of law, LaFond did not depart from any such code. In doing so, the dissent fails to make all inferences and construe all facts in Ammons's favor, as we must.

Finally, the dissent ignores the testimony of multiple experts in the record before us stating that LaFond's performance fell well below the standard of care required by law, policies, procedures, and practice. One expert reports her professional opinion that the investigation of Resident A's accusation, and its resolution within the facility, were grossly inadequate. The expert points out that no monitoring or safeguards were put in place, and Grant was allowed to be alone with female patients for whom he was not responsible. This expert further notes a number of actions, taken after Ammons's molestation came to light, that should have been taken after Resident A's accusations. She finds the degree of inaction at the facility "astounding" and "hard to fathom" in a professional situation,

Indeed, we note the similarity between the evidence here and that in *Neely*. Like superintendent Feinstein in *Neely*, LaFond was aware that allegations of sexual abuse had been brought against one of the hospital staff. And as in *Neely*, these allegations triggered an investigation of the staff member that determined that the allegations were not credible. In both cases, the harm to the plaintiff resulted from the hospital administrator's failure to take meaningful steps to prevent the formerly accused staff member from interacting one-on-one with female patients. In *Neely*, we found these facts sufficient to support a reasonable jury's determination that Feinstein failed to exercise professional judgment. The record in this case presents even more evidence of such a failure on the part of LaFond, as it additionally supports a claim that LaFond remained unreasonably ignorant of or ignored the overwhelming evidence that Grant continued to flagrantly abuse his position.[17] Whereas Feinstein reprimanded Terry for poor

and she concludes that LaFond was "grossly and extremely negligent." We do not agree with the dissent that this testimony "should be afforded minimal weight." *See Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009) (it is improper to weigh evidence on summary judgment).

[16]In so holding, we hold LaFond accountable with respect to her own failure to manage and supervise her employees. We do not, as the dissent suggests, create § 1983 liability on the basis of respondeat superior. It is well established that a supervisor may be held liable for a constitutional rights violation based on his or her own neglect in failing to properly superintend his or her subordinate's duties. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009). In *Youngberg* itself, the Court held that a failure to institute appropriate procedures could give rise to liability under the Fourteenth Amendment. 457 U.S. at 322-23. *See also Simmons v. Navajo Co.*, 609 F.3d 1011, 1020 (9th Cir. 2010) ("To survive summary judgment, the [plaintiffs] must therefore adduce evidence that [the supervisors] themselves acted or *failed to act* unconstitutionally, not that some subordinate did." (emphasis added)).

[17]The dissent chastises us for pointing out this additional factual support for Ammons's claim, arguing that no case, not even *Neely*, supports our reasoning. We note in response that, under *Neely*, LaFond's failure to con-

judgment and Hosley placed restrictions on Terry's duties, LaFond made no changes with respect to managing Grant.

**[12]** As a final matter, we note that *Youngberg* articulated the professional judgment standard as the proper instruction for the jury; our opinion merely recognizes that the ultimate decision in this case should likewise go to a jury. Our holding does not impose liability upon LaFond; nor does it, as the dissent suggests, conclusively prescribe any particular administrative conduct.[18] We hold only that, supposing Ammons's allegations are true, a reasonable jury could conclude that LaFond, like Feinstein, demonstrated "a substantial departure from accepted professional judgment" that amounts to a violation of Ammons's clearly established Fourteenth Amendment right to safety during her involuntary commitment to a state

---

sider the previous accusations against Grant *alone* supports our conclusion that qualified immunity is unwarranted. Nonetheless, we do not blindly ignore the additional facts suggesting deficiencies in LaFond's performance. To pretend that these facts have no bearing on the relevant inquiry — whether a jury could decide in Ammons's favor — would render us, as the dissent puts it, "unreflective and naive."

[18]The dissent accuses us of being "unreflective and naive" in this assessment. While we do not dispute that public officials may, in order to avoid trials, tailor their behavior to our qualified immunity decisions, we will not use this as the basis to transform Ammons's burden in defeating qualified immunity into her burden in proving her case. The dissent's accusation, and indeed its entire position, is premised on a fundamentally incorrect notion that denial of qualified immunity is equivalent to a conclusive determination that the Constitution has been violated. Under such incorrect logic, we dare not deny qualified immunity unless we are certain that constitutional liability will be proved.

Our denial of qualified immunity, as that in *Neely*, however, makes no prediction as to whether a jury will find in the plaintiff's favor. Our decision simply recognizes that whether LaFond should be absolved of any wrongdoing is for a jury to decide. Put another way, we hold no more than that judgment in Ammons's favor is not legally foreclosed. Whether public officials choose to interpret this opinion as something more than this is entirely up to them.

hospital. We must conclude, therefore, that LaFond is not entitled to qualified immunity.

## B. Webster

**[13]** We next consider whether the facts alleged against Webster support a Fourteenth Amendment claim against him. The pertinent facts alleged against Webster are the following. Webster, as Director of Nursing from January to April 2003, was "closer" to Ammons while Grant was molesting her than was LaFond. As CEO at CSTC during the last three weeks of Ammons's residence, Webster had access to information about Ammons, including her intake assessment indicating that she was particularly vulnerable to sexual abuse. Importantly, Ammons neither alleges nor introduces any evidence that, during Ammons's time at CSTC, Webster knew of the allegations by Resident A or the subsequent investigation of Grant.[19]

**[14]** We cannot conclude, even taking all of Ammons's allegations as true, that a jury could find that Webster demonstrated a substantial departure from reasonable professional judgment. He spent approximately eighteen days as CEO of CSTC during Ammons's stay, which would not have provided him with reasonable and sufficient time to become apprised of, and take meaningful action with respect to, the situation between Grant and Ammons. Moreover, during his time as Director of Nursing, there is no indication that he was aware of the previous allegations against Grant such that a reasonable professional in his position would have a reason to closely or personally monitor Grant's behavior or to alert his superiors as to any impropriety. As with Hosley, the Director of Nursing in *Neely*, the "absence of a sufficiently strong directive from [LaFond] served to understate, to all staff

---

[19]We reiterate that Webster's lack of knowledge, while not determinative, is relevant to the application of the *Youngberg* professional judgment standard.

members, the risk that [Grant] posed to female patients." 50 F.3d at 1511. The record contains no indication that Webster disregarded, remained unreasonably ignorant of, or failed to exercise reasonable professional judgment with respect to Ammons's safety. Therefore, because the alleged facts are insufficient to maintain a constitutional claim against him, Webster is entitled to qualified immunity.

## VI.

Ammons has alleged the violation of her clearly established constitutional right to safe conditions during her involuntary commitment to a state hospital. The contours of this right have been clearly established by the objective test set forth in *Youngberg* and applied to similar facts in *Neely*. Taking all the facts in a light most favorable to Ammons, we hold that the allegations and evidence against LaFond sufficiently support a constitutional violation that defeats qualified immunity, while those against Webster do not. The district court's denial of summary judgment as to LaFond is **AFFIRMED**. The district court's denial of summary judgment as to Webster is **REVERSED**. The case is **REMANDED** for further proceedings consistent with this opinion.

### AFFIRMED IN PART AND REVERSED IN PART.

---

BYBEE, Circuit Judge, concurring in part and dissenting in part:

In *Youngberg v. Romeo*, the Supreme Court held that those involuntarily committed in state-run mental hospitals have "rights . . . to reasonable conditions of safety." 457 U.S. 307, 321 (1982). Recognizing that "an institution cannot protect its residents from all danger of violence," the Court found that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised." *Id.* 320-21

(citation and quotation marks omitted). Despite the Court's instruction that "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made," *id.* at 321, the majority embarks on precisely this quest, defining a new code of conduct for mental health hospital administrators and casting "professional personnel . . . [into] the shadow of an action for damages," *id.* at 325.

Not only does the majority author a code of model professional conduct, it finds its code to be both constitutionally compelled and clearly established. Indeed, under the majority's code:

- "[a] reasonable administrator [must] . . . take [resident] allegation[s] into account when assigning and supervising staff members in cottages where female patients reside[ ]," even when those allegations have been investigated and determined to be "unfounded," Maj. Op. at 10968-69;

- administrators must personally undertake "a basic review of [patients'] file[s]" and monitor patients' bedroom decorations on "walk[s] through the [hospital] facility," to catch signs of burgeoning and illicit relationships between patients and staff, *id.* at 10970; and

- administrators will be held strictly liable for any harm caused in part by their employees' failures to communicate with them, including a failure to make administrators aware of "specific concerns voiced by parents," *id.* at 10969-70 ("[A] reasonable hospital administrator . . . would have taken steps to *ensure* that the staff . . . brought [warning] signs to the administrator's attention so that she could take the necessary steps to prevent [an

employee] from abusing his position." (emphasis added)).

These new mandates are unjust, unfounded, and unworkable. None is required by the Constitution or established by our cases. For these reasons, I respectfully dissent as to LaFond.[1]

## I

Let's be clear—neither the majority nor the appellee claims that LaFond was personally aware of an inappropriate relationship between Grant and Ammons. In fact, it is undisputed that LaFond did not have subjective knowledge of Grant's improper attentions to Ammons. Therefore LaFond's liability —in fact, the court's ability to entertain a § 1983 suit against her—only exists if she can be held responsible for the allegedly unconstitutional actions of her subordinates.

## A

Fundamental to the principle of qualified immunity is the notion that an individual will not be held constitutionally liable—cannot even be subject to suit—for anything *but his own actions* that are in violation of clearly established constitutional law. This is because § 1983 liability cannot be established solely on a theory of *respondeat superior*. As the Supreme Court recently reminded us: "vicarious liability is inapplicable to . . . § 1983 suits"; "[i]n a § 1983 suit . . . masters do not answer for the torts of their servants"; and "[a]bsent vicarious liability, each Government official . . . is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948-49 (2009). We have long held the same. *See, e.g*, *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007); *Menotti v. City of*

---

[1]I concur in that portion of the majority opinion reversing the denial of summary judgment as to Webster.

*Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

The standard necessary to establish a § 1983 violation by a supervisor is no different than the standard necessary to establish a § 1983 violation by any other government official: "a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948 (emphasis added). For instance, in *Iqbal*, the Supreme Court held that it was insufficient for the plaintiff to allege that the supervisor defendant had "mere knowledge of his subordinate's discriminatory purpose[.]" *Id.* at 1949. As the Court explained: "In the context of determining whether there is a violation of clearly established right [sic] to overcome qualified immunity, purpose rather than knowledge is required to impose . . . liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Id.*

In this case, the constitutional provision at issue is the Due Process Clause of the Fourteenth Amendment. The Supreme Court first articulated the standard for proving violations of the involuntarily committed's rights to bodily safety in *Youngberg v. Romeo*, 457 U.S. 307 (1982). The Court found that those involuntarily committed in state-run mental hospitals have "rights . . . to reasonable conditions of safety" but that, to respect those rights, the mental hospital employees need only exercise "professional judgment." *Id.* at 321. The Court said: "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. In other words, "[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised." *Id.* at 321 (citation omitted). For this reason, the *Youngberg* professional judgment standard is less a "professional judgment" standard

than it is an "any professional judgment" standard because exercising *any* professional judgment will shield a state hospital professional from § 1983 liability.

The Supreme Court emphasized the latitude that must be allowed to mental health professionals under the Fourteenth Amendment by explaining that the *Youngberg* professional judgment standard is not an opportunity for lower courts to play Monday morning quarterback: "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* To ensure that courts would not use the *Youngberg* professional judgment standard to categorize as constitutional violations any professional decision with which they did not agree, the Court established a presumption in favor of the professionals: "[D]ecisions made by the appropriate professional are entitled to a presumption of correctness." *Id.* at 324. The Court explained that a mental health professional deserves this favorable presumption because, acting alone, she "may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day. *The administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages.*" *Id.* at 324-25 (emphasis added). The Court clearly did not want state mental health professionals to act in fear of the lay judgment—pronounced with great certainty and with all the clarity that hindsight affords—of the courts. *See Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S. Ct. 2074, 2085 (2011) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."). Hence a *professional* judgment standard.

B

Applying *Iqbal* to *Youngberg*, it is clear that Ammons cannot establish that LaFond violated her constitutional rights. For constitutional purposes, "decisions made by [LaFond] are

entitled to a presumption of correctness." *Youngberg*, 457 U.S. at 324. In order to state a cause of action, Ammons must allege sufficient facts that LaFond's own actions toward Ammons were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [LaFond] actually did not base [her] decision[s] on such a judgment." *Id.* at 323. She has failed to do so. In an absence of sufficient evidence, we do not leave it to a jury to offer its own opinion of the administration of the institution— we find that LaFond wins.

The majority too recites these standards, but it does not believe them. It gives lipservice to the professional standards component of *Youngberg* but then rests its decision entirely on its own non-professional judgment. The majority dutifully states that "the judgment of professionals must not depart substantially from 'accepted professional judgment, practice, or standards,' " Maj. Op. at 10960 n.5 (quoting *Youngberg*, 457 U.S. at 323).[2] But we will scour the majority opinion in vain for any evidence of what constitutes "accepted professional judgment, practice, or standards" in the administration of a residential mental health facility for youths. There is no evidence that the majority has considered or read any such standards. Instead, the majority has simply made them up.[3] The

[2]The majority makes it sound as though *Youngberg* requires hospital administrators to act according to professional standards or risk § 1983 liability. This is not what *Youngberg* requires. Rather, as the Supreme Court noted, "the appropriate standard was whether the defendants' conduct was *such a substantial departure* from accepted professional judgment, practice, or standards in the care and treatment of [patients] as to demonstrate that the [administrators] did not base their conduct on a professional judgment." *Youngberg*, 457 U.S. at 314 (quotation marks omitted) (emphasis added). The Constitution does not require hospital administrators to toe some industry-set line. Rather, as per the Supreme Court, the Constitution allows hospital administrators room to act—even to "depart" from professional judgment, practice, and standards—as long as those actions do not so depart that *no* professional judgment was exercised. *See id.*

[3]As the majority concedes, there is no "such [ ] 'golden code' of professional conduct against which to measure LaFond's actions." Maj. Op. at 10971 n.15. I think the majority has simply supplied the missing code; the majority claims the jury gets to make it up. Either way, there is no such code of professional judgment; either way, the majority is wrong.

majority has mistaken its own *ipse dixit* for the judgment of mental health professionals.[4]

Even if LaFond violated Ammons's constitutional right to Fourteenth Amendment substantive due process, she cannot be subject to suit for that violation unless the "state of the law in [2003] gave [LaFond] fair warning that [her] alleged treatment of [Ammons] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). If the majority cannot even identify the professional standards for judging LaFond's decisions, how can we begin to think that the law was so "beyond debate" that LaFond "would have understood that what [s]he is doing violates that [law]"? *al-Kidd*, 563 U.S. at ___, 131 S. Ct. at 2083 (internal quotation and citation omitted). As I explain in the following sections, it is anything but clear that LaFond's decisions violated established law.

II

I observe first that it is difficult to apply the *Youngberg* professional judgment standard to LaFond's actions towards Ammons because, according to the record, apart from making general decisions about the facility in which Ammons (and others) lived, LaFond did not take any actions concerning Ammons. Therefore, to find LaFond eligible for suit for violating Ammons' constitutional rights, we have to find that LaFond's *inactions* toward Ammons were unconstitutional.

Not knowing exactly how to begin analyzing the constitutionality of an infinite list of LaFond's inactions towards

---

[4]The majority writes: "Ironically, the dissent, like us, cannot articulate the code of professional conduct for administrators of residential health facilities, and yet the dissent somehow conclusively determines that, as a matter of law, LaFond did not depart from any such code." Maj. Op. at 10971 n.15. The absence of a professional standard means that LaFond prevails—that is precisely what it means that "decisions made by [LaFond] are entitled to a presumption of correctness." *Youngberg*, 457 U.S. at 324.

Ammons, I turn to the majority opinion.[5] Sifting through its analysis, it becomes clear that the majority identified three of LaFond's inactions as unconstitutional: (1) LaFond failed to "take[ ] . . . into account" the past allegations against Grant when she "assign[ed] and supervis[ed] staff members," Maj. Op. at 10968; (2) LaFond failed to personally review each patient's file, in an effort to "become aware of the escalating impropriety between" employees and patients, *id.*; and (3) LaFond failed to ensure that she was informed "of specific concerns voiced by parents," *id.* at 10970. These "failures" deserve close inspection, both because LaFond will now have to endure the personal and financial costs of a trial because of them and because they are now statements of constitutional law, applicable to all mental health administrators in the Ninth Circuit.[6] I discuss each failing in turn.

[5]I do not mean to imply that a state official's inactions could never lead to liability under § 1983. *See* Maj. Op. at 10970 n.14. I merely mean to point out that, without any references to professional standards or norms to guide its analysis, the majority's list of LaFond's apparently unconstitutional inactions reads like legal grapeshot.

[6]The majority's assertion that, in finding LaFond not protected by qualified immunity, it has not "conclusively prescribe[d] any particular administrative conduct," Maj. Op. at 10973, is unreflective and naive. As the Supreme Court recently reminded us, rulings in qualified immunity cases "have a significant future effect on the conduct of public officials . . . and the policies of the government units to which they belong." *Camreta v. Greene*, 563 U.S. ___, 131 S. Ct. 2020, 2030 (2011). Such impact on future behavior is not an unintended consequence: "[T]hey are rulings self-consciously designed to produce this effect by establishing controlling law and preventing invocations of immunity in later cases." *Id.*

Accordingly, courts routinely require state officials to act in accordance with the statements of constitutional law spelled out in previous appellate opinions denying qualified immunity. In fact, the majority's opinion here is such a case. According to the majority's own analysis, without *Neely v. Feinstein*, 50 F.3d 1502 (9th Cir. 1995), LaFond would be free from liability. *See* Maj. Op. at 10965. Because of *Neely*, she goes to trial. In the future, mental health professionals can ignore *Ammons* at their peril. The consequences of the majority's ruling here could hardly be more certain.

A

The majority identifies LaFond's disregard of the past allegations against Grant as her first constitutional failure. As the majority explains, "LaFond was aware that Grant previously had been accused of sexually molesting a minor female patient. . . . *A reasonable administrator, exercising professional judgment with respect to providing safe conditions, would have taken Resident A's allegation into account when assigning and supervising staff members in cottages where female patients resided.*" Maj. Op. at 10968-69 (emphasis added).

First, let me point out that this is an incorrect application of the *Youngberg* professional judgment standard. If the majority had been properly applying the professional judgment standard, the majority would have asked if LaFond's decision to make employment assignments irrespective of allegations that, two years earlier, had been determined to be unfounded was a decision based on her professional judgment. *Youngberg*, 457 U.S. at 321 ("[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised." (citation omitted)). In the absence of clear contrary evidence, the majority should have held that LaFond's decision not to indefinitely consider the unfounded allegations against Grant was "presumptively valid." *Id.* at 323.

The majority did neither of these things. Instead, the majority concluded that "any reasonable administrator" would have considered the unfounded allegations against Grant—or any unfounded but serious allegations made against any employee —in perpetuity. I couldn't disagree more. It is not at all clear to me that "any reasonable administrator" would—or should —take into account allegations against an employee when making assignments concerning that employee, especially when those allegations are "unfounded." Nor is it clear that an

administrator even *could* make decisions about an employee based on unfounded allegations against that employee.

In this case, LaFond handled the first set of allegations against Grant exactly as she was required to do. Washington State law requires that "any . . . employee of the department [of social and health services] . . .[who] has reasonable cause to believe that a child has suffered abuse . . . shall report such incident, or cause a report to be made, to the proper law enforcement agency or to the department [of social and health services]." Wash. Rev. Code 26.44.030(1)(a) (emphasis added). As the CEO of the Child Study and Treatment Center ("CSTC"), LaFond was an employee of the Washington State Department of Social and Health Services ("DSHS"), and she was responsible for other employees under the same obligation. When Resident A came forward with allegations that Grant had sexually abused her, her allegations were promptly reported to Child Protective Services ("CPS"), as is required by Wash. Rev. Code 26.44.030(1)(a). At that point, CPS conducted its own investigation, during which time, LaFond ordered that Grant not have contact with female residents. LaFond did not interfere with the investigation, but let CPS interview the victim, witnesses, and the victim's psychologist. After those interviews, LaFond was told by Resident A's treating psychologist that she had recanted her allegations against Grant, and LaFond passed that information on to CPS. Notably, CPS did not immediately close its investigation; instead, it interviewed Grant. Only then did it close the investigation and conclude that the allegations were "unfounded" because "it would have been extremely unlikely that they could have occurred as stated."[7]

---

[7]The majority makes much of the fact that LaFond knew that Resident A did not personally recant her allegations to CPS. *See* Maj. Op. at 10967. But CPS itself knew that Resident A did not personally recant her allegations to CPS, decided still to interview Grant, and then closed the case because the allegations were unfounded. LaFond is entitled to rely on CPS's professional judgment about when investigations are closed and allegations unfounded. While it might be understandable if LaFond still had some question about Grant even after the close of the investigation, it cannot be the case that the Constitution requires that she harbor such suspicions, much less that she take action against him.

Once CPS closed its investigation and formally cleared Grant, LaFond did not consider Resident A's unfounded allegations in making employment decisions about Grant. Although this is beside the point—because the *Youngberg* standard does not call for a reasonableness analysis—this seems reasonable to me. LaFond was not required to continue to consider the unfounded allegations against Grant by any Washington state law, regulation, or procedure. I can't see why LaFond is liable under the Due Process Clause of the Fourteenth Amendment for acting consistently with state law. *See Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994).

Nor, in fact, might LaFond have been allowed to consider unfounded allegations against Grant, as doing so might have violated Washington State's complicated government employment scheme, which includes at least (1) a Fourteenth Amendment due process property right in some civil service employment and the attendant constitutional protections, *see Fuller v. Employment Sec. Dep't of the State of Wash.*, 762 P.2d 367 (Wash. Ct. App. 1988); (2) a statute requiring the destruction of "information relating to employee misconduct or alleged misconduct" in situations where "such information [was] determined to be false" or "where the employee has been fully exonerated of wrongdoing," Wash. Rev. Code 41.06.450(1)(a); and (3) collective bargaining agreements that may place limits on CSTC administrators' ability to discipline psychiatric child care counselors. If the majority is correct, the Due Process Clause required LaFond to do what she was forbidden to do by Washington law.[8]

---

[8]The majority responds to this point by saying, "We do not . . . suggest that the administrator must disclose previous accusations of sexual misconduct to any other party, include the accused's name on any public database, or impose any adverse consequence as a result of the accusation." Maj. Op. at 10969 n.13. If we accept this rebuttal, then we have accepted a reality in which hospital administrators may have to keep lists of individuals against whom unfounded accusations were made—so as to closely monitor the employees' future interactions with patients (as required by this majority)—but that, to comply with (at least Washington) state law, those lists might have to remain secret and unwritten. The majority is either blind to or comfortable with this future. I am not.

We on the Ninth Circuit are well aware of the perils and heartache that can come when individuals are dogged by accusations from which they have been cleared. In *Humphries v. County of Los Angeles*, 554 F.3d 1170 (9th Cir. 2009), *reversed in part on other grounds by* 131 S. Ct. 447 (2010), we recognized that this kind of unshakable pursuit by past false accusations can be a "nightmare." *Id.* at 1180. The facts of *Humphries* bring this nightmare to life. The Humphries were parents falsely accused of abuse by a rebellious child, triggering their arrests and the removal of their remaining children. *Id.* at 1175. After the state dismissed the criminal case against them, the Humphries petitioned for further relief, and the criminal court found them "factually innocent" of the charges and ordered the arrest records sealed and destroyed. *Id.* The juvenile court likewise dismissed as "not true" all counts of the dependency petition against them. *Id.* The Humphries thought they'd been cleared. But despite their efforts, and pursuant to state law, their names were listed in a state database of "known or *suspected* child abusers," which a wide variety of organizations—including government agencies, employers, law enforcement entities, and other public and private groups—either had access to or, in some cases, were required to consult. *Id.* at 1175-76 (emphasis added). The Humphries tried to have their names removed from the database, but no such procedure existed in California, so they sued in the federal courts, claiming that maintenance of the state database violated the Due Process Clause of the Fourteenth Amendment because "identified individuals are not given a fair opportunity to challenge the allegations against them." *Id.* at 1176. We held that they were right—their inability to challenge their listing in the database "violate[d] the[ir] procedural due process rights," *id.* at 1202, in part because "there is a great human cost . . . to being falsely accused of being a child abuser," which should prompt us to "protect[ ] . . . citizens against such calumny" "with the same passion that [we] condemn[ ] the child abuser for his atrocious acts," *id.* at 1194.

In light of our decision in *Humphries*, it is more than ironic —it is plainly inconsistent—that we would hold that the Due Process Clause *requires* that state hospital administrators do what we have previously held the Due Process Clause prohibits state actors from doing. *Compare id.* at 1193 ("the Humphries have an interest in not being stigmatized . . . if they have not committed the acts underlying the reports . . . . [T]hey have an interest in pursuing employment . . . and securing the appropriate licenses for working with children without having to be subject to an additional investigation, delays, and possible denial of a benefit. . . .") *with* Maj. Op. at 10968 ("While LaFond had *no cause* to discipline Grant, because he had been *exonerated* of the molestation charge, she certainly had reason, in light of her duties with respect to the safety of her patients, to manage and monitor his duties more carefully." (emphases added)); *id.* n.13 ("We fully acknowledge that Grant was exonerated as an official matter . . . [but] a reasonable hospital administrator . . . would have done more to protect vulnerable female patients.").[9] Viewed in this light, the majority opinion, which mandates that state hospital administrators always remember and never forget even *unfounded* allegations against hospital employees, is not only unreasonable, it is manifestly unjust and inconsistent with our decision in *Humphries*.[10]

---

[9] The majority's confident constitutional pronouncements are all the more remarkable for the fact that we do not know any of the actors here: We do not know the CPS investigators, their reputation and methods; LaFond and her staff; or Grant. Yet we have no difficulty finding that LaFond relying on CPS's professional judgment was a substantial departure from her own accepted professional judgment.

[10] I am unpersuaded by the majority's point that *Humphries* is not implicated because the majority is not requiring hospital administrators to "include the accused's name on any public database, or impose any adverse consequence as a result of the accusation." Maj. Op. at 10969 n.13. It is not at all clear to me that assigning Grant to a different ward—what the majority is requiring, *see id.* at 10966-67—would not have been an adverse employment action, for which LaFond might have opened herself to suit. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 70-71 (2006) (finding that reassignment of duties, even to a position with the same job description, can be "materially adverse"); *Humphries*, 554 F.3d at 1201-02.

B

According to the majority, LaFond's second unconstitutional inaction was her failure to "take[ ] steps to become aware of" the signs of Grant's inappropriate attentions to Ammons "through a basic review of Ammons's file or by simply walking through the facility." Maj. Op. at 10970. In so holding, the majority again erred by not applying *Youngberg*'s professional judgment standard or the *Youngberg* presumption in favor of LaFond.

Instead, the majority pulled this constitutional responsibility out of its hat. How can it say, without precedent or evidence or expert testimony or support of any kind, that the Constitution requires that LaFond have looked personally at Ammons's file? Or personally walk through the cottage into Ammons's room to observe her wall decorations? Notably, the majority does not cite to any case, statute, DSHS regulation, CSTC policy or custom, or industry expectation that LaFond personally review patient files or monitor patient room decor. Nor does the majority explain how, in the future, mental health administrators should know which patients' files they are constitutionally compelled to review personally or which halls the Fourteenth Amendment requires them to walk. Such vigilance might be routine protocol in one facility, extraordinarily conscientious administration in another facility, and simply impracticable in yet a different facility. Nothing in *Youngberg* tells us how to make such choices, only that administrators must be presumed to have made a professional judgment, and they are liable only if they exercise no judgment at all. *Youngberg* does not appoint us to serve as the Board of Supervisors for Washington's mental health facilities, with the power to hire, fire, promote, or discipline its administrators. Yet the majority's new standard would empower us to evaluate—in extraordinary detail and *post hoc*

—the performance of such administrators, all in the name of the Due Process Clause.[11]

This case demonstrates the complexity of the majority's new code of professional conduct. As the majority notes, CSTC is a "small" community, *see* Maj. Op. at 10968, housing a maximum of sixty-four residents, but to serve these residents, CSTC has a complicated and multilayered organizational structure. Although the record does not contain a complete account of CSTC's chain of command, we do have a glimpse of what practically it would mean for LaFond to be required to personally monitor and supervise each staff member and patient. CSTC contains three cottages; each cottage has at least one supervisor, one registered nurse, one psychiatric social worker, and one psychologist. Each cottage is divided into four "pods"; each pod has at least one residential counselor on staff twenty-four hours a day and recreation therapy staff on site during daytime and early evening hours. As far as we know, this makes LaFond ultimately responsible

---

[11]Bereft of any standard against which to judge LaFond's professional judgment, the majority relies on the reports of two purported "experts" for support that LaFond's conduct fell below the standard of care for hospital administrators. Maj. Op. at 10971 n.15. But it does not appear from the record that the authors of these reports were ever qualified to opine on the standard of care required of hospital administrators. Rather, the record suggests that the authors are *unqualified* to evaluate LaFond's professional judgment as neither has studied hospital administration or has worked as a hospital administrator. As such, their unqualified opinions on LaFond's conduct should be afforded minimal weight.

Even if the witnesses were qualified, their reports are conclusory and do nothing to illuminate how, if at all, LaFond departed from the standard of care. They contain no discussion of industry standards, and no discussion —other than what we all can see through hindsight—of what LaFond should have done differently. *See, e.g.*, Report of Katherine A. Kent at 7 ("hospital administrators, including Ms. LaFond and Mr. Webster, failed to take any meaningful precautions to protect [Ammons]"); Report of Jane W. Ramon at 10 ("Mary LaFond and Norm Webster[ ] were grossly and extremely negligent in allowing a sexual relationship to develop between patient [Ammons] . . . and adult male staff").

for at least thirteen supervisors—four at each of three cottages and CSTC's director of nursing—and approximately thirty-six residential counselors.

According to the cottage psychologist supervising Ammons's care, this staffing structure meant that any patient-related concerns would be reported by the residential counselors to the cottage supervisor, "up through the chain of command" to CSTC's director of nursing, and then to LaFond, making LaFond three levels removed from the supervision of Grant, a residential counselor, and four levels removed from the direct care of Ammons.

The majority's failure to acknowledge the organizational complexity at a "small" institution like CSTC is just one indication that it has not thought through the impracticable and burdensome implications its holding will have for the heads of state-run mental health hospitals, including ones possibly larger than CSTC. *See Youngberg*, 457 U.S. at 322-23 ("there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions"). We have no business prescribing managerial behavior for mental institutions. Clearly, the majority is out of its depth and wrong in so doing.

## C

The third of LaFond's so-called constitutional errors was her failure to ensure that her employees did their jobs. The majority casts this failure in two ways: (1) "a reasonable hospital administrator, exercising professional judgment, would have taken steps to ensure that the staff who worked closely with Grant appreciated the seriousness of the situation and brought these signs to her attention so that she could take the necessary steps to prevent Grant from abusing his position," Maj. Op. at 10970; and (2) "LaFond should have at least taken steps to ensure that she was informed of specific concerns voiced by parents such as [Ammons's foster mother] so

that she could look into the matter further," *id.* at 10970. I am not even sure how to respond to such ad hoc constitutional pronouncements.

The majority neither suggests nor cites to anything in the record that indicates what LaFond should have done to "ensure" that her subordinates reported more faithfully to her. Certainly if LaFond's subordinates had concerns that Ammons was being abused, as employees of DSHS, they, like she, were under a statutory obligation to report that abuse to the proper authority, which may have been LaFond, CPS, or law enforcement, or all three. *See* Wash. Rev. Code 26.44.030(1)(a). Their failures to apprise LaFond of whatever warning signs may have been visible to them were their own failures and not LaFond's.

Further, contrary to the majority's assertion, there is no indication in the record that LaFond did not "take[ ] steps to ensure that she was informed of specific concerns voiced by parents." Maj. Op. at 10970. The record does not include a comprehensive account of what instruction or training LaFond offered to her employees. We know that, according to LaFond, "[i]t was [her] practice, whenever an allegation of abuse was made which was determined to be unfounded, that [she] would direct supervisors to educate and counsel staff about any high risk behavior on their part, and watch the person accused closely for a period of time." In the context of this practice, it is meaningful, then, that "[n]othing negative was ever reported to [LaFond] concerning Mr. Grant after [the first] incident was investigated."**[12]**

---

**[12]**I should not need to make a counterargument at this level of factual granularity. *See al-Kidd*, 563 U.S. at ___, 131 S. Ct. at 2084 ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." (internal citations omitted)). The majority has cited *no cases* for the proposition that the Due Process Clause requires LaFond to specifically instruct her employees to report parent concerns to her. None. The majority does not even argue that

Without any evidence that LaFond ignored her subordinates' warnings or that she did not exercise professional judgment in her supervision of her employees, LaFond cannot be held constitutionally liable for her subordinates' failures.[13] The majority's contrary holding amounts to constitutional liability based on respondeat superior, and we know that § 1983 liability cannot rest on respondeat superior. *See Iqbal*, 129 S. Ct. at 1948; *Preschooler II*, 479 F.3d at 1183. At least, it couldn't before today.

### III

I strongly disagree with the majority that LaFond's inactions violated Ammons's constitutional rights, but I *absolutely* disagree that it was so obvious to LaFond that she was violating the Constitution by not doing what she was not doing. *See al-Kidd*, 131 S. Ct. at 2083 (the contours of the constitutional right at issue must be "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right") (citation and quotations omitted) (emphasis added). As discussed above, it is not clear to me even now that LaFond violated the Constitution. How then was she supposed to have known that she was violating the Constitution? Certainly not by reading *Youngberg*. LaFond is thus entitled to qualified immunity.

For the majority, *Neely v. Feinstein*, 50 F.3d 1502 (9th Cir.

---

*Neely* holds this. In light of the absence of case law imposing on LaFond such a requirement, I should not need to point out, as I have, that there is no indication in the record that LaFond did not instruct her employees to report parent concerns. But the majority rests its denial of qualified immunity—and exposes LaFond to potential liability—at least in part on this spurious argument.

[13]The majority argues that at least one employee warned LaFond about "improper clinical staff handling of reported sexual incidents in the resident cottages." Maj. Op. at 10952. But those warnings concerned patient-to-patient sexual impropriety, not staff-to-patient sexual abuse.

1995), is the answer: "*Youngberg* and *Neely* serve as pre-existing, clearly established law as to what conduct supports infringement of the Fourteenth Amendment rights of involuntarily committed hospital patients." Maj. Op. at 10965. In other words, because of *Neely*, it should have been clear to LaFond that she "violated the Constitution if [she] ran afoul of the objective *Youngberg* professional judgment standard as applied in *Neely*." *Id.* at 10965.

But *Neely* is anything but clear. In *Neely*, we addressed the question of qualified immunity for four employees of a state-run psychiatric center: Stephen Feinstein, the hospital superintendent; Linda Murgo, the chair of a staff committee convened to investigate the charges of abuse by Jess Terry, an employee, against Cathy Neely, a patient; Cecilia Hosley, the hospital's director of nursing; and John Brown, a building supervisor, responsible for assigning staff to the various hospital wards. All of these defendants were supervisors over Terry, and each of these defendants was either aware of the previous allegations against Terry or aware of the restrictions against him working one-on-one with female patients. Despite these similarities, we found qualified immunity for all of the defendants but Feinstein. We found qualified immunity for Murgo because her investigation of Terry comported with the hospital's regulations. *Id.* at 1511. We found qualified immunity for Director Hosley because the record did not indicate that her actions—her failure to put in writing the restrictions on Terry and her decision to replace the absolute restriction against Terry working with female patients with a restriction against him working with them one-on-one—were violations of a "strong directive" from her superiors. *Id.* And we found qualified immunity for Supervisor Brown because, despite his decision to assign Terry to work with females when previously he'd been prevented from doing so, "we [could not] say that he acted unreasonably when faced with a staff shortage." *Id.* But for Feinstein, we did not find qualified immunity because "a reasonable hospital official would have done much

more to eliminate the risk that Terry would sexually abuse female patients under the hospital's care." *Id.* at 1509.

These discursive and contradictory analyses are more than "complex," Maj. Op. at 10966 n.11; they do not make sense. What cleared three of the defendants from liability—compliance with hospital regulations, compliance with superior directives (if any), and reasonableness in light of practicalities—could have cleared Feinstein, if we had but analyzed his actions with those standards of scrutiny. There is no indication that any of Feinstein's actions were violations of hospital regulations or that his decision to reprimand Terry, once cleared, but to not do "much more" was not reasonable in light of hospital practicalities.[14] Yet Feinstein was subject to suit and liability, and the other supervisors were not. Even if she had read *Neely*, LaFond would not have clearly known that she could be liable like Feinstein and not protected by qualified immunity as were Murgo, Hosley, and Brown.

And even within the Feinstein-related analysis, our legal standards contradict. In determining the question of Feinstein's qualified immunity, we simultaneously applied three different standards to the question of hospital administrator liability: the *Youngberg* professional judgment standard *and* a "conscious indifference amounting to gross negligence" standard *and* an objective "deliberate indifference." We did this by importing the "conscious indifference" standard from *Estate of Conners by Meredith v. O'Connor*, 846 F.2d 1205, 1208 (9th Cir. 1988), which, as the majority notes, was the origin for equating the *Youngberg* standard with "conscious indifference." *See* Maj. Op. at 10962. Then we noted that "[a]lthough the *Conners* opinion used the term 'conscious

---

[14]Frankly, I have no idea what "much more" means in this context. Nor does *Neely* suggest anything "more" Feinstein could have done. This would be merely an intellectual lacuna, a mere judicial low point, except that now, the majority throws LaFond down that hole, which we made and did not fill.

indifference,' both parties [in *Neely*] used the term 'deliberate indifference.' " 50 F.3d at 1507. We then explained the origin of "deliberate indifference" and its importation from Eighth Amendment to Fourteenth Amendment jurisprudence, but we did not reject—as we should have—the parties' proposition that "deliberate indifference" was equivalent to "conscious indifference," which we had earlier said was equivalent to the *Youngberg* professional standard.[15]

After confusing the standard we were actually applying—by casting the *Youngberg* professional judgment standard in any name but its own—we raised a squall about whether any of the three standards require subjective awareness. No, we said, they do not. *Neely*, 50 F.3d at 1508 ("[T]he *Youngberg* professional judgment standard is necessarily an objective test."); ("[O]ur Fourteenth Amendment jurisprudence has never required officials to have a subjective awareness of the

---

[15]The Supreme Court rejected the "deliberate indifference" standard when it adopted the professional judgment standard in *Youngberg*. 457 U.S. at 312 n.11. Accordingly, we should have rejected that standard in *Neely* and not ambiguously entertained it, as we did. In fact, *Neely* relies on our decision in *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) for the proposition that "state officials" with "more than a mere suspicion that an attack will occur," *Neely*, 50 F.3d at 1508, "must take steps to protect prisoners from the *threat* of serious harm or injury by other prisoners" *id.* (quoting in part *Berg,* 794 F.2d at 459 (emphasis in original)). *Neely* reasoned that *Berg* and other cases "amply demonstrate that . . . in the face of known threats to patient safety, state officials may not act (or fail to act) with conscious indifference, but must take adequate steps in accordance with professional standards to prevent harm from occurring." *Neely*, 50 F.3d at 1508. As such, *Neely* incorporated the *Berg* rule. But the rule *Berg* articulated (and *Neely* quoted) was the standard for "deliberate indifference," not the professional judgment standard. *See Berg*, 794 F.2d at 459 ("The 'deliberate indifference' standard requires . . . [an official] have more than a mere suspicion that an attack will occur" (citation and quotations omitted)); *see also Redman v. County of San Diego*, 942 F.2d 1435, 1442 (9th Cir. 1991) ("The *Berg* court . . . defined what 'deliberate indifference' means in this circuit" (citing *Berg*)). *Neely's* citation to and adoption of *Berg* therefore operated to import the "deliberate indifference" standard into what should have been a professional-judgment analysis.

risk of harm in order to be deemed 'deliberately indifferent' "). Unfortunately, we then appear to have contradicted ourselves by stating that "in the face of *known threats* to patient safety, state officials may not act (or fail to act) with conscious indifference, but must take adequate steps in accordance with professional standards to prevent harm from occurring." *Id.* (emphasis added). And then, to compound the problem, we held that one of the defendants in *Neely* was covered by qualified immunity expressly because she did *not* have subjective awareness of the risk of threat. *Id.* at 1511 ("[T]here is nothing in the record to establish that Hosley was personally apprised of the same evidence of Terry's prior sexual assaults that Feinstein reviewed.").

In other words, in *Neely*, we applied different levels of scrutiny to each of the four supervisor-defendants; we erroneously conflated two disparate standards with the *Youngberg* professional judgment standard; we contradicted ourselves on whether the proper standard required subjective awareness for a constitutional violation; and we contradictorily held that one supervisor-defendant was liable for risks he was not aware of but that another supervisor-defendant was not liable for risks of which she was not "personally apprised." *Id.* Read faithfully, *Neely* does not serve to clearly establish anything and cannot be "faithfully appl[ied]." Maj. Op. 10966 n.11.[16]

---

[16]I am not the first to point out the ambiguity in *Neely*'s discussion of the applicable legal standard. In *L.W. v. Grubbs*, 92 F.3d 894 (9th Cir. 1996), we rejected the argument that *Neely* established " 'conscious indifference amounting to gross negligence' " as the standard for § 1983 liability. *Id.* at 897 (citing *Neely*, 50 F.3d at 1508 (internal quotations and citation omitted)). *Neely*, we explained, "was predicated on our reasoning in the first *Wood v. Ostrander* opinion that we later amended," *id.*, the amendment of which "[t]he *Neely* panel should have been well aware." *Id.* at 897 n.3. When we amended *Wood*, we "step[ped] back from espousing gross negligence as the proper standard." *Id.* But the *Neely* panel "[s]omehow . . . omitted that from their decision." *Id.* For this reason, the "[*Neely*] language . . . is either incorrect to the extent that it approves the gross negligence standard, or it must be limited to the claims of inmate

Unlike the majority, I do not see how *Neely* was sufficient to put LaFond on notice that she should have treated Grant or Ammons differently. In my opinion, *Neely* was not even correct. That aside, whatever *Neely* stands for, it does not "make[ ] crystal clear," *id.*, that by not indefinitely considering unfounded accusations against employees, by not personally reviewing Ammons's file, and by not "ensuring" that her employees fulfilled their statutory obligations to report concerns of sexual abuse—concerns of which she was not aware —LaFond should have known that she was violating the Constitution. At the least, we should have granted qualified immunity to LaFond.

### IV

For the reasons I have explained, I would hold that LaFond did not violate the Due Process Clause. In any event, I would find LaFond covered by qualified immunity. I respectfully dissent from that portion of the judgment and the majority opinion. For similar reasons, I agree that Webster is so protected, and I concur in that part of the majority's opinion and judgment.

---

plaintiffs injured because of a miscarriage of the 'professional judgment of a [government] hospital official' in the context of a captive plaintiff." *Id.* at 897. If we are not sure of the scope of *Neely* liability, it is unreasonable to assume LaFond would know better how *Neely* applies. *See id.* at 898 ("It is little wonder that our district courts have found difficulty in navigating Section 1983 damage claims waters.").